# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF INDIANA
# FORT WAYNE DIVISION

| | |
|---|---|
| LAVONYA J. MOORE, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) CAUSE NO. 1:10-CV-00423 |
| | ) |
| MICHAEL J. ASTRUE, | ) |
| Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |

## OPINION AND ORDER

Plaintiff LaVonya Moore, who is proceeding *pro se*, appeals to the district court from a final decision of the Commissioner of Social Security ("Commissioner") denying her application under the Social Security Act (the "Act") for a period of disability and Disability Insurance Benefits ("DIB"), and Supplemental Security Income ("SSI").[1] (*See* Docket # 1.) For the following reasons, the Commissioner's decision will be AFFIRMED.

## I. PROCEDURAL HISTORY

Moore first applied for DIB and SSI in May 2005, alleging disability beginning in September 2001. (Tr. 380-82.) The Commissioner denied her application initially. (Tr. 20.) Upon reconsideration, an Administrative Law Judge ("ALJ") awarded her a closed period of disability from July 18, 2004, through the date she returned to work, November 15, 2005; Moore agreed with this decision at the time it was rendered. (Tr. 20.)

On March 12, 2008, however, Moore filed the instant application for DIB and SSI,

---

[1] All parties have consented to the Magistrate Judge. *See* 28 U.S.C. § 636(c).

alleging disability as of February 1, 2006. (Tr. 419-48.) The Commissioner denied her application initially and upon reconsideration, and Moore requested an administrative hearing. (Tr. 56-66, 77-82, 96-97.) A hearing was conducted by ALJ Yvonne Stam on September 21, 2009, at which Moore, who was represented by counsel, and a vocational expert ("VE") testified. (Tr. 419-48.) On November 6, 2009, the ALJ rendered an unfavorable decision to Moore, concluding that she was not disabled because she could perform a significant number of jobs in the economy despite the limitations caused by her impairments. (Tr. 14-24.) The Appeals Council denied her request for review, at which point the ALJ's decision became the final decision of the Commissioner. (Tr. 4-6.) Moore then filed a complaint with this Court on December 3, 2010, seeking relief from the Commissioner's final decision. (Docket # 1.)

## II. FACTUAL BACKGROUND[2]

*A. Background*

At the time of the ALJ's decision, Moore was forty-five years old; had a high school education; and possessed work experience as a cafeteria worker, light janitorial cleaner or housekeeper, and machine cleaner. (Tr. 23, 57, 193, 422-24.) Moore alleges that she is disabled due to bilateral knee, back, and right shoulder pain arising from arthritis and chondromalacia patella.[3] (Opening Br. 3; Tr. 115.)

At the hearing, Moore, who was about 5'4" tall and weighed almost 200 pounds, testified that she lives alone in a one-story subsidized apartment and that she independently performs her

---

[2] In the interest of brevity, this Opinion recounts only the portions of the 448-page administrative record necessary to the decision.

[3] Chondromalacia patella is the softening of the articular cartilage of the patella. STEDMAN'S MEDICAL DICTIONARY 369 (28th ed. 2006).

2

self-care, household tasks, and shopping. (Tr. 250, 422, 425-26, 433.) She stated that she can sit for only "a couple of hours or so" and that she tries to keep her feet up when doing so. (Tr. 426-27.) Similarly, she testified that she can stand three or four hours before she needs to lie down and put her feet up. (Tr. 427.) She also stated that she has difficulty reaching with her right arm. (Tr. 430.) In addition, Moore testified that she experiences chronic itching of her hands, a condition she alleges is contagious; she further confided, however, that her physician suggested it might have a psychological cause. (Tr. 434-38.) Nevertheless, Moore denied having any mental problems. (Tr. 430.)

### B. *Summary of the Relevant Medical Evidence*

Moore was evaluated by Dr. Eric Jenkinson of Orthopaedics Northeast on April 23, 2004, for bilateral knee pain. (Tr. 247-48.) He noted that she had received Synvisc injections for her knees two years earlier and had done "very well". (Tr. 247.) He diagnosed her with osteoarthritis and administered Synvisc injections to her knees. (Tr. 247-48.) In May 2004, Moore reported to Dr. Jenkinson that her pain was not as significant and that she was "able to do more." (Tr. 245.) He again administered Synvisc injections bilaterally. (Tr. 245.)

On April 22, 2005, Moore, who was working as a kitchen helper at the time, returned to Dr. Jenkinson, stating that she was "doing okay" but that she still had a lot of problems when she had to stand or sit for a length of time. (Tr. 193, 244.) He diagnosed her with osteochondral defects and mild osteoarthritis; prescribed Hyalgan injections and Ultracet; and recommended that she work only part-time. (Tr. 244.) He further opined that because of her knees, Moore should neither sit nor stand for any length of time, commenting that "an alternating position would be helpful." (Tr. 244.) In August 2005, Moore received additional knee injections. (Tr.

3

236-37, 241-42.)

In October 2005, Dr. Jenkinson noted that Moore "did pretty well with things." (Tr. 241.) He reflected a diagnosis of osteochondral defects of the patellofemoral joint and discussed various treatment options with her, including anti-inflammatories, injections, physical therapy, bracing, and surgery. (Tr. 241.) He assigned her "permanent restrictions" of working only five hours per day and twenty-five hours per week. (Tr. 241.)

Also in October 2005, Moore sought treatment at the emergency room for pain and itching in her hands. (Tr. 232-33.) She reported that she had been treated numerous times by her family doctor and a dermatologist for the condition (*see* Tr. 263-307), and that she had recently been referred to a psychiatrist. (Tr. 232.) The examining physician found no evidence of skin irritation. (Tr. 232-33.)

In February 2006, Dr. Jenkinson noted that Moore was "doing pretty well", and he administered additional knee injections. (Tr. 238-40.) She received more injections in October 2006. (Tr. 300.)

On September 18, 2007, Moore underwent a psychological assessment at Park Center. (Tr. 310-12.) She told the examiner that she did not desire or see the need for psychological services and that she only attended the appointment to follow her lawyer's instructions. (Tr. 310.) Upon mental status exam, Moore's appearance and behavior were appropriate, and she exhibited normal insight, judgment, affect, speech, thinking form, thought content, and memory. (Tr. 310.) Nonetheless, Park Center reflected a diagnosis of psychotic disorder NOS on the initial assessment. (Tr. 311.)

On October 3, 2007, Moore returned to Dr. Jenkinson for an evaluation of her right

4

shoulder, reporting that she had been experiencing pain and spasms for several months. (Tr. 235-36.) Moore had pain upon testing of the rotator cuff and 4/5 strength with upper extremity motion. (Tr. 235.) Diagnostic imaging from several months earlier indicated moderate to severe osteoarthritis of the glenohumeral joint, and moderate degenerative changes of the humeral head. (Tr. 368.) Dr. Jenkinson prescribed home exercises to increase her motion and strength, and discussed other possible treatments with Moore, including medication, injections, and surgery. (Tr. 237.) In November 2007, Moore received more knee injections. (Tr. 282-83.)

On May 14, 2008, Moore was seen at the orthopaedic clinic of Matthew 25 Health Clinic. (Tr. 272.) Dr. Brian Kaplansky, an orthopaedist, restricted her to working a maximum of twenty hours per week. (Tr. 271-72.) She received additional knee injections. (Tr. 273-75.)

On May 20, 2008, Moore was evaluated by Dr. Deitrick Gorman at the request of the state disability office. (Tr. 249-50.) He noted some decreased range of motion in her right shoulder and that she had bilateral chondromalacia of the patella. (Tr. 251-52.) Moore told him that she does not like to take pills and thus does not consistently take her Mobic and Ultram. (Tr. 250.)

On May 27, 2008, Dr. F. Lavallo reviewed Moore's record and opined that she could lift ten pounds frequently and twenty pounds occasionally; stand or walk about six hours in an eight-hour day; sit about six hours in an eight-hour day; perform unlimited pushing and pulling; and occasionally climb, balance, stoop, kneel, crouch, or crawl. (Tr. 254-61.) He also opined that she was limited in reaching overhead. (Tr. 257.) Dr. Lavallo noted that Moore does not take pain medications regularly and that no surgical interventions had been planned to correct her impairments. (Tr. 259.)

5

## III. STANDARD OF REVIEW

Section 405(g) of the Act grants this Court "the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).

The Court's task is limited to determining whether the ALJ's factual findings are supported by substantial evidence, which means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005) (citation omitted). The decision will be reversed only if it is not supported by substantial evidence or if the ALJ applied an erroneous legal standard. *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000).

To determine if substantial evidence exists, the Court reviews the entire administrative record but does not re-weigh the evidence, resolve conflicts, decide questions of credibility, or substitute its judgment for the Commissioner's. *Id.* Rather, if the findings of the Commissioner are supported by substantial evidence, they are conclusive. *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003). Nonetheless, "substantial evidence" review should not be a simple rubber-stamp of the Commissioner's decision. *Clifford*, 227 F.3d at 869.

## IV. ANALYSIS

### A. *The Law*

Under the Act, a claimant is entitled to DIB or SSI if she establishes an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to . . . last for a continuous period of not less than 12 months." 42 U.S.C. §§ 416(i)(1), 423(d)(1)(A), 1382c(a)(3)(A). A physical or mental

impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. §§ 423(d)(3), 1382c(a)(3)(D).

The Commissioner evaluates disability claims pursuant to a five-step evaluation process, requiring consideration of the following issues, in sequence: (1) whether the claimant is currently unemployed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals one of the impairments listed by the Commissioner, *see* 20 C.F.R. § 404, Subpt. P, App. 1; (4) whether the claimant is unable to perform her past work; and (5) whether the claimant is incapable of performing work in the national economy.[4] *See* 20 C.F.R. §§ 404.1520, 416.920; *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). An affirmative answer leads either to the next step or, on steps three and five, to a finding that the claimant is disabled. *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001). A negative answer at any point other than step three stops the inquiry and leads to a finding that the claimant is not disabled. *Id.* The burden of proof lies with the claimant at every step except the fifth, where it shifts to the Commissioner. *Clifford*, 227 F.3d at 868.

### B. The ALJ's Decision

On November 6, 2009, the ALJ rendered the decision that ultimately became the Commissioner's final decision. (Tr. 14-24.) She found at step one of the five-step analysis that Moore's gross monthly earnings had at times exceeded the substantial gainful activity limit after her alleged onset date, particularly from the second quarter of 2006 through the second quarter of

---

[4] Before performing steps four and five, the ALJ must determine the claimant's residual functional capacity ("RFC") or what tasks the claimant can do despite her limitations. 20 C.F.R §§ 404.1520(e), 404.1545(a), 416.920(e), 416.945(a). The RFC is then used during steps four and five to help determine what, if any, employment the claimant is capable of. 20 C.F.R. §§ 404.1520(e), 416.920(e).

7

2007. (Tr. 16.) Nevertheless, since Moore did not consistently engage in disqualifying work activity after her alleged onset date, the ALJ proceeded to step two of the sequential analysis. (Tr. 16.) At step two, the ALJ concluded that Moore's bilateral knee and right shoulder osteoarthritis were severe impairments. (Tr. 16.)

At step three, the ALJ determined that Moore's impairment or combination of impairments were not severe enough to meet a listing. (Tr. 18.) Before proceeding to step four, the ALJ determined that Moore's testimony of debilitating limitations was not entirely credible (Tr. 20), and that she had the following RFC:

> [T]he claimant has the residual functional capacity to perform light work . . . except she can only occasionally climb, balance, stoop, kneel, crouch, and crawl. In addition, she can only occasionally reach overhead with her right arm. She is also limited to standing for a total of less than six hours in an eight-hour period. Furthermore, the claimant cannot perform tasks that require a fast pace, public contact, or more than brief and superficial contact with co-workers and supervisors.

(Tr. 19.)

Based on this RFC and the VE's testimony, the ALJ concluded at step four that Moore was unable to perform any of her past relevant work. (Tr. 22.) The ALJ then concluded at step five that she could perform a significant number of light work jobs within the economy, including folder (200 to 250 jobs in the region), bagger (750 to 800 jobs in the region), and photocopy machine operator (1,500 to 2,000 jobs in the region). (Tr. 23.) Accordingly, Moore's claims for DIB and SSI were denied. (Tr. 23-24.)

## C. Discussion

Here, Moore's *pro se* appeal of the Commissioner's final decision essentially equates to a plea to this Court to reweigh the evidence with the hope that it will come out in her favor this

8

time. To that end, Moore challenges the RFC assigned by the ALJ in light of the opinions of her treating orthopaedists limiting her to working twenty to twenty-five hours per week. Of course, a plea to the Court to reweigh evidence or resolve conflicts in evidence is ultimately unavailing. *See Cannon v. Apfel*, 213 F.3d 970, 974 (7th Cir. 2000) (explaining that the court is not allowed to substitute its judgment for the ALJ by "reweighing evidence" or "resolving conflicts in evidence").

Although an ALJ may ultimately decide to adopt the opinions expressed in a medical source statement concerning the ability of a claimant to perform work-related activities, the RFC assessment is an issue reserved to the ALJ. 20 C.F.R. §§ 404.1527(e), 416.927(e); SSR 96-5p. The RFC assessment "is based upon consideration of *all* relevant evidence in the case record, including medical evidence and relevant nonmedical evidence, such as observations of lay witnesses of an individual's apparent symptomology, an individual's own statement of what he or she is able or unable to do, and many other factors that could help the adjudicator determine the most reasonable findings in light of all the evidence." SSR 96-5p (emphasis added); *see* 20 C.F.R. §§ 404.1545, 416.947. Thus, a medical source opinion concerning a claimant's work ability is not determinative of the RFC assigned by the ALJ. *See* SSR 96-5p ("[A] medical source statement must not be equated with the administrative finding known as the RFC assessment.").

Here, the ALJ concluded that Moore had the RFC to perform light work, which generally requires the ability to lift ten pounds frequently and twenty pounds occasionally and stand or walk six hours out of an eight-hour workday, *see* 20 C.F.R. §§ 404.1567, 416.967, except that she found Moore could only occasionally climb, balance, stoop, kneel, crouch, crawl, or reach

9

overhead with her right arm. In addition, the ALJ limited Moore to standing *less* than six hours in an eight-hour workday (which the ALJ explained at the hearing incorporated a sit-to-stand option (Tr. 447-48))[5]; and restricted her from performing tasks that require a fast pace, public contact, or more than brief and superficial contact with co-workers and supervisors.

As the ALJ explained, this RFC is consistent with the limitations opined by Dr. Lavallo, the state agency physician, who concluded in May 2008 that Moore could perform light work that did not require more than occasional climbing, balancing, stooping, kneeling, crouching, crawling, or reaching overhead with her right arm. (Tr. 21.) Of course, "[t]he regulations, and this Circuit, clearly recognize that reviewing physicians and psychologist[s] are experts in their field and the ALJ is entitled to rely on their expertise." *Ottman v. Barnhart*, 306 F. Supp. 2d. 829, 839 (N.D. Ind. 2004); *see* 20 C.F.R. §§ 404.1527(f)(2)(i), 416.927(f)(2)(i) ("State agency medical and psychological consultants and other program physicians and psychologists are highly qualified physicians and psychologists who are also experts in Social Security disability evaluation.").

The ALJ did indeed acknowledge that the opinion of Dr. Lavallo conflicted with the opinions of Dr. Jenkinson and Dr. Kaplansky, Moore's treating orthopaedists, in one respect—that is, the orthopaedists restricted Moore to working only twenty to twenty-five hours per week. (Tr. 22.) The ALJ, however, affirmatively resolved this conflict. *See Stephens v. Heckler*, 766 F.2d 284, 287 (7th Cir. 1985) (explaining that when the record contains conflicting medical evidence, the ALJ has an affirmative responsibility to resolve that conflict). The ALJ reasoned that the orthopaedists' restriction to part-time work was primarily due to Moore's knee

---

[5] *See* note 6 *supra*.

problems, which the ALJ then adequately accommodated through the incorporation of an additional standing limitation with a sit-to-stand option.[6] (Tr. 22.) Furthermore, as explained above, a medical source opinion concerning a claimant's work ability is *not* determinative of the RFC assigned by the ALJ. *See* SSR 96-5p; *see generally Schmidt v. Astrue*, 496 F.3d 833, 842 (7th Cir. 2007*)* ("The patient's regular physician may want to do a favor for a friend and client, and so the treating physician may too quickly find disability." (quoting *Stephens*, 766 F.3d at 289)).

Moreover, the ALJ properly considered other evidence as well when determining Moore's RFC, such as her work activity after the alleged onset date and her daily activities, which included cooking, driving, doing laundry, shopping for groceries, and performing housework. (Tr. 21); *see* 20 C.F.R. §§ 404.1545, 416.945 (instructing the ALJ to consider *all* of the relevant evidence in the case record when assessing a claimant's RFC); *Gardner v. Barnhart*, No. 02 C 4578, 2004 WL 1470244, at *13 (N.D. Ill. June 29, 2004) (considering a claimant's limitations in activities of daily living when assigning her RFC); SSR 96-8p ("The RFC assessment must be based on all of the relevant evidence in the case record, such as . . . [r]eports of daily activities [and] . . . attempts to work . . . .").

---

[6] Although the ALJ did not expressly incorporate a sit-to-stand option into the RFC, she did include it in the hypothetical posed to the VE at the hearing:

> ALJ: [G]iven that with these light jobs with less than the six hours of standing we're looking at a sit/stand option in that case. And what is it that you're basing your testimony on that?
>
> VE: Yes, Your Honor, the Dictionary of Occupational Titles does not provide for a sit/stand option. I base my testimony on my experience in functional job analysis of how jobs are performed, observation of jobs. Also, recent university studies that indicate from employers as well as employees from the University of Texas Pan American that jobs such as the ones that I've described can be performed with a sit/stand option.

(Tr. 447-48.) Therefore, the jobs cited by the ALJ at step five accommodated Dr. Jenkinson's recommendation that Moore perform work that alternates between sitting and standing. (Tr. 214.)

Of course, when assessing Moore's RFC, the ALJ also determined the credibility of her symptom testimony, concluding that she was "not entirely credible." (Tr. 20); *see Scheck v. Barnhart*, 357 F.3d 697, 701 (7th Cir. 2004) (explaining that making a credibility determination is inherent in an ALJ's RFC assessment). Because the ALJ is in the best position to evaluate the credibility of a witness, her determination is entitled to special deference. *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000). If an ALJ's determination is grounded in the record and she articulates her analysis of the evidence "at least at a minimum level," *Ray v. Bowen*, 843 F.2d 998, 1002 (7th Cir. 1988), creating "an accurate and logical bridge between the evidence and the result," *Ribaudo v. Barnhart*, 458 F.3d 580, 584 (7th Cir. 2006), her determination will be upheld unless it is "patently wrong." *Powers*, 207 F.3d at 435.

In determining Moore's credibility, the ALJ noted that the objective medical evidence did not necessarily support the severity of Moore's subjective complaints. *See* 20 C.F.R. §§ 404.1529(c)(3), 416.929; *Hall v. Barnhart*, No. 1:04-cv-1847-DFH-TAB, 2006 WL 3206096, at *4 (S.D. Ind. June 15, 2006) (explaining that the lack of objective medical evidence is one factor to be considered by the ALJ when making his credibility determination). For example, the ALJ observed the dearth of objective medical evidence in support of Moore's alleged contagious skin rash on her hands (Tr. 21); purported back pain (Tr. 22); and alleged complete inability to reach above shoulder height with her right arm (Tr. 22).

The ALJ also noted that although Moore complained of problems with her right hip when getting in and out of bed or a bathtub, she had not required or received regular treatment for such hip problem since her alleged onset date. (Tr. 22); *see* 20 C.F.R. §§ 404.1529, 416.929; SSR 96-7p (explaining that a claimant's treatment is a factor that the ALJ should consider when

12

determining a claimant's credibility). And, as stated above, the ALJ properly considered other evidence, such as Moore's daily activities and work activity, in connection with determining her credibility. *See* 20 C.F.R. §§ 404.1529, 416.929; *Berger v. Astrue*, 516 F.3d 539, 546 (7th Cir. 2008) ("Although the diminished number of hours per week indicated that [the claimant] was not at his best, the fact that he could perform some work cuts against his claim that he was totally disabled."); SSR 96-7p (explaining that a claimant's daily activities should be considered when determining a claimant's credibility).

In short, the ALJ adequately articulated her reasoning for the determination that Moore's testimony of debilitating limitations was "not entirely credible", and her determination is not "patently wrong." *Powers*, 207 F.3d at 435. And, after determining Moore's credibility and resolving conflicts in the medical evidence, the ALJ arrived at an RFC that is supported by substantial evidence of record. *See* 20 C.F.R. §§ 404.1527(e)(1), 416.927(e)(1) (articulating that the final responsibility for deciding the claimant's RFC and whether she is disabled is "reserved to the Commissioner"). As a result, Moore's plea for a remand is unavailing, and the Commissioner's final decision will be affirmed.

## V. CONCLUSION

For the reasons articulated herein, the decision of the Commissioner is AFFIRMED. The Clerk is directed to enter a judgment in favor of the Commissioner and against Moore.

SO ORDERED. Enter for this 23rd day of June, 2011.

S/Roger B. Cosbey  
Roger B. Cosbey,  
United States Magistrate Judge